UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| TYNESHA KANDI ARMAND, | 13-CV-5-LJV-MJR |
| | REPORT AND RECOMMENDATION |
| Plaintiff, | |
| -v- | |
| C.O. MOSKO, *et al.*, | |
| Defendants. | |

_____

This case has been referred to the undersigned pursuant to 28 U.S.C. §636(b)(1) for all pre-trial matters and to hear and report upon dispositive motions. (Dkt. No. 73). Presently before the Court is the issue of whether plaintiff Tynesha Kandi Armand[1] exhausted her administrative remedies before bringing suit as required under the Prison Litigation Reform Act ("PLRA"). For the following reasons, the Court finds that plaintiff did not exhaust her administrative remedies with respect to her excessive force claim against defendants C.O. Mosko, Sgt. Calleri, Sgt. Jones, and C.O. D. Williams. It is therefore recommended that this claim be dismissed.

## **BACKGROUND**

Plaintiff Tynesha Kandi Armand, a former inmate housed at multiple New York State correctional facilities, commenced this 42 U.S.C. §1983 action in 2011 in the United States District Court for the Eastern District of New York. (Dkt. No. 1). Plaintiff's original complaint alleged that officials and employees of the New York State Department of Corrections and Community Supervision ("DOCCS") subjected her to harassment, retaliation, and excessive force in violation of her constitutional rights. (*See id.*). The

---

[1] At the time of the events in question, plaintiff was known as James Armand.

Eastern District of New York severed part of plaintiff's case and transferred it to this Court in 2013 (Dkt. No. 26 at 3-4; Dkt. No. 33), after which plaintiff filed an amended complaint (Dkt. No. 47). Plaintiff's amended complaint sets forth two causes of action: (1) excessive force by defendants C.O. Mosko, Sgt. Calleri, Sgt. Jones, and C.O. D. Williams at Five Points Correctional Facility on May 17, 2011; and (2) retaliation by defendant C.O. M. McGrain at Southport Correctional Facility in late 2011/early 2012. (*See id.*).

In 2014, defendants filed a pre-answer motion for dismissal of plaintiff's excessive force claim on exhaustion grounds and dismissal of her retaliation claim for failure to state a cause of action. (Dkt. No. 52). This Court issued a Report and Recommendation in 2016 recommending that plaintiff's excessive force claim go forward and that a portion of her retaliation claim (concerning McGrain filing a false, retaliatory misbehavior report against plaintiff) go forward as well. (Dkt. No. 77). As relevant here, the Court found defendants' request for dismissal of plaintiff's excessive force claim on exhaustion grounds to be premature because the parties had not yet engaged in any discovery. (*Id.* at 6-9). Judge Vilardo adopted the Court's Report and Recommendation in 2017. (Dkt. No. 80).

After the parties exchanged paper discovery and took plaintiff's deposition, they requested an evidentiary hearing to determine whether plaintiff exhausted her administrative remedies with regard to her excessive force claim. (*See* Dkt. No. 105); *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011) (approving district court's decision to hold evidentiary hearing on PLRA exhaustion question because there is no right to trial by jury on the issue). The Court granted the parties' request and held an evidentiary hearing on October 30, 2018. (Dkt. No. 106). Plaintiff and Patrick O'Neill, the Inmate Grievance

Program Supervisor at Five Points when plaintiff was incarcerated there, testified at the hearing, and Defense Exhibits ("Def. Exs.") 1-10, 12-15, and 25 were admitted into evidence. (*See id.*). The parties thereafter filed post-hearing briefs and response briefs (Dkt. Nos. 107-10), and the Court heard oral argument from counsel on March 20, 2019 (Dkt. No. 113). After considering all of the hearing testimony and exhibits, the submissions of the parties, and argument from counsel, the Court concludes that plaintiff did not exhaust her administrative remedies with respect to her excessive force claim. It is therefore recommended that this claim be dismissed.

## DISCUSSION

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). It is undisputed that the PLRA applies to plaintiff's excessive force claim.

Because failure to exhaust administrative remedies under the PLRA is an affirmative defense, "defendants bear the initial burden of establishing . . . that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). If defendants meet their initial burden, plaintiff must then show that something rendered the applicable procedure "unavailable" to her. *Id.*; *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (holding that there are "no limits on an inmate's obligation to exhaust" aside from the textual "qualifier" that remedies must be

"available" to the inmate).  In *Ross v. Blake*, the Supreme Court outlined "three kinds of circumstances in which an administrative remedy, although officially on the books," would not be available to the inmate.  136 S. Ct. at 1859.  First, an administrative remedy is unavailable if "it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id.*  Third, an administrative remedy will be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1860.

Here, defendants have met their initial burden of demonstrating that a grievance procedure existed at Five Points and that it applies to plaintiff's excessive force claim.  Patrick O'Neill, the Inmate Grievance Program ("IGP") Supervisor at Five Points when plaintiff was incarcerated there (*see* Tr. 4-5; Def. Ex. 1),[2] testified credibly at the evidentiary hearing that the DOCCS grievance procedure, Directive 4040, applied during the events in question.[3]  Pursuant to Directive 4040, the grievance process begins when an inmate files a grievance complaint with the Inmate Grievance Resolution Committee ("IGRC"), a body comprised of both inmates and prison officials.  (Tr. 10; Def. Ex. 2 §§701.4, 701.5(a)).[4]  Generally, a grievance complaint must be filed at the inmate's current facility within twenty-one days of the alleged incident, although the IGP Supervisor can extend this deadline for a total of forty-five days based upon a showing of mitigating

---

[2]   References to "Tr." are to the transcript of the evidentiary hearing.  (Dkt. No. 107-1).
[3]   After an evidentiary hearing, "[i]t is for the Court to determine issues of . . . credibility in deciding whether an inmate has complied with the exhaustion requirements of the [PLRA]."). *Brown v. Dubois*, No. 9:15-CV-1515(LEK/CFH), 2018 WL 2078823, at *5 (N.D.N.Y. Apr. 10, 2018), *report and recommendation adopted*, 2018 WL 2077891 (N.D.N.Y. May 2, 2018).
[4]   Defense Exhibit 2 is the version of Directive 4040 that was in effect at the time plaintiff was incarcerated at Five Points.  (*See* Tr. 8).

circumstances by the inmate.  (Tr. 10, 12; Def. Ex. 2 §§701.5(a), 701.6(g)).  Upon receipt and review of the grievance, the IGP Supervisor assigns it a subject code and short title. (Tr. 7; Def. Ex. 2 §701.5(a)(2)).  Depending on the assigned code, the IGRC reviews the grievance and requests investigations.  (Tr. 7).  The IGRC has up to sixteen days to resolve the grievance informally.  (Def. Ex. 2 §701.5(b)(1)).  If there is no informal resolution, the IGRC conducts a hearing to answer the grievance or makes a recommendation to the Superintendent.  (Def. Ex. 2 §701.5(b)(2)).  The IGRC's decision may then be appealed to the Superintendent and then to the Central Office Review Committee.  (Def. Ex. 2 §701.1(c)).

An expedited procedure applies when the IGP Supervisor codes the grievance as a Code 49 harassment grievance.  (Tr. 7; Def. Ex. 2 §701.8).  Code 49 grievances bypass the IGRC and proceed directly to the Supervisor for his or her review.  (Tr. 7, 24; Def. Ex. 2 §701.8(b)).  Upon promptly determining that the grievance, if true, would represent a *bona fide* case of harassment, the Superintendent initiates an investigation by a higher-ranking supervisory official.  (Def. Ex. 2 §701.8(c), (d)).  Within twenty-five days of the filing of a Code 49 grievance, the Superintendent must transmit a decision to the inmate. (Def. Ex. 2 §701.8(f)).  The inmate may then appeal to the Central Office Review Committee.  (Def. Ex. 2 §701.8(h)).

Plaintiff was incarcerated at Five Points between May 17 and July 19, 2011.  (Def. Ex. 1).  With the exception of her first few days at the facility, which she spent in the mental health unit, plaintiff was housed in the facility's Special Housing Unit ("SHU").  (Tr. 5, 44, 71-72; Def. Ex. 12).  Directive 4040 includes procedures to ensure that inmates housed in the SHU have access to the grievance program.  (Def. Ex. 2 §701.7).  In

particular, SHU inmates may request a copy of Directive 4040 from the law library, and grievance forms and envelopes are available and provided to SHU inmates upon request. (Tr. 15, 19; Def. Ex. 2 §701.7(a)).  Writing assistance is also available for inmates, if needed.  (Tr. 49).  Because SHU inmates are confined to their cells twenty-three hours a day, they depend upon the corrections staff to forward their grievances to the IGRC for filing.  (Tr. 57; Ex. 2 §701.7(a)(3)).  In the Five Points SHU, a sergeant goes cell-to-cell during the night shift, collects grievances from inmates, and places them in a lockbox. (Tr. 14).  Security staff then takes the lockbox to the mailroom, where mailroom staff unlocks the box and transfers any grievances to the IGP Supervisor's mailbox.  (Tr. 60-61).  When the IGP Supervisor arrives for work the next morning, he takes the grievances from his mailbox and reviews them.  (Tr. 15).

During plaintiff's time in the SHU, O'Neill, or a designee during his absence from the facility, made weekly rounds in the SHU to help inmates access the grievance program as required under Directive 4040.  (Tr. 16; Def. Ex. 2 §701.7(c)).  Inmates who wished to speak with O'Neill during his rounds could respond to his oral announcement upon entering the SHU.  (Tr. 16-17).  If a SHU inmate informed O'Neill that a grievance had not been received and filed, O'Neill might tell the inmate to re-submit the grievance, and he would consider that as a mitigating circumstance justifying an extension of the filing deadline.  (Tr. 17-18).  Similarly, if an inmate asked about the status of his grievance, O'Neill would personally look into the grievance at his office.  (Tr. 17).  O'Neill was also willing to accept grievances submitted to him in person during his rounds in the SHU.  (Tr. 59).  O'Neill testified that if plaintiff had asked him to take her grievance on account of her mail being interfered with, he likely would have done so.  (Tr. 23).  However, O'Neill has

no recollection of plaintiff prior to the instant litigation (*id.*), and plaintiff testified that she never saw O'Neill during the two months she was housed in the Five Points SHU (Tr. 118).

The credible evidence in this case demonstrates that plaintiff did not file a grievance at Five Points regarding her excessive force claim in accordance with Directive 4040.  O'Neill, as custodian of the Five Points IGP records, searched those records but could not find any grievances or related correspondence from plaintiff from when she was incarcerated at Five Points.  (Tr. 26).  Plaintiff likewise has not produced any copies of grievances or related paperwork that she purportedly submitted to the IGRC office during her time at Five Points.  Plaintiff did try to file a grievance about the excessive force incident *after* she had been transferred from Five Points to Southport Correctional Facility in late July 2011, but O'Neil properly rejected the grievance under Directive 4040.  (Tr. 26-29).  Specifically, plaintiff mailed a grievance dated August 8, 2011 from Southport to Five Points regarding the May 17, 2011 excessive force incident.  (Def. Ex. 4).  In the very first sentence of her grievance, plaintiff states that she did *not* file a grievance when she was incarcerated at Five Points:

> Please take notice that a Grievance wasn't filed at Five Point [sic] because I feared for my life.

(*Id.*).  O'Neill did not receive plaintiff's August 8, 2011 grievance until August 24, 2011, well after plaintiff's deadline for filing a grievance had expired.  (Def. Ex. 5).  The same day he received the grievance, O'Neill sent plaintiff a memorandum rejecting it as untimely and because she filed it at the wrong facility.  (Tr. 31; Def. Ex. 5).[5]  On August

---

5   Under Directive 4040, a grievance must be filed at the facility where the inmate is presently housed, even if it pertains to an incident at a different facility.  (Tr. 12-13; Def. Ex. 2 §701.5(a)(1)).

28, 2011, plaintiff wrote O'Neill a letter asking him to extend her time to file a grievance on the grounds that she could not prepare a grievance at Five Points due to injuries caused by corrections officers there and because she lacked the necessary writing supplies.  (Def. Ex. 6).  O'Neill sent plaintiff a response memorandum on September 8, 2011 reiterating that she must file any grievances at her current facility, and in any event, that her extension request was beyond the forty-five-day time limit in which he could grant her an extension of time to file a grievance.  (Def. Ex. 7).

Based upon the foregoing evidence, defendants have met their burden of demonstrating that a grievance procedure existed at Five Points and that plaintiff failed to comply with the procedure by neglecting to file a grievance with the Five Points IGRC in compliance with Directive 4040.  Plaintiff's belated attempt to file a grievance from Southport plainly does not satisfy the exhaustion requirement because the PLRA requires *proper* exhaustion of administrative remedies.  *See Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (noting that the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out, and doing so *properly*") (emphasis in original) (internal quotation marks, citation, and brackets omitted); *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006) (holding that filing an untimely grievance is not proper exhaustion).

The burden now shifts to plaintiff to show that Directive 4040 was not "available" to her within the meaning of *Ross*.  Plaintiff argues under the second *Ross* circumstance that Directive 4040 was "opaque" and "incapable of use" because she handed her grievances to corrections officers in the Five Points SHU only to have the officers fail to forward them to the IGRC for filing.  *See Williams*, 829 F.3d at 124-26 (finding inmate

exhausted all administrative remedies that were available to him by handing his grievance to a correction officer in the SHU, even though the officer never formally filed the grievance on his behalf, because Directive 4040 "give[s] no guidance whatsoever to an inmate whose grievance was never filed").[6] In particular, plaintiff testified at the hearing that she wrote several grievances and letters about the May 17, 2011 incident approximately two weeks after she arrived in the Five Points SHU. (Tr. 72-75). She remembers the specific time frame because her mother visited her in the middle of June 2011 to celebrate her birthday. (Tr. 75). Plaintiff further testified that she handed the grievances to corrections officers in the SHU, but the officers placed the grievances on the side of the lockbox instead of inside the box, resulting in them never being filed with the IGRC as required under Directive 4040. (Tr. 87-88, 116). Plaintiff testified that this happened multiple times. (Tr. 116).

Plaintiff's testimony that she handed grievances to corrections officers who never filed them with the IGRC does not withstand scrutiny and is unworthy of belief because plaintiff has given conflicting statements as to why she did not file a grievance during her time at Five Points. In particular, in the August 8, 2011 grievance she sent from Southport to Five Points, plaintiff acknowledged having never filed a grievance at Five Points because she feared retaliation from corrections staff. (Def. Ex. 4). Plaintiff then changed her story in the letter she sent to O'Neill on August 28, 2011 by claiming that she could not prepare a grievance at Five Points due to injuries caused by corrections staff and

---

[6] *Williams*, which plaintiff heavily relies upon in her post-hearing briefs, is inapposite because the Second Circuit in that case *accepted as true* (as it was required to do on defendants' Rule 12(b)(6) motion to dismiss) the plaintiff's allegation that he handed his grievance to a correction officer who then neglected to forward it to the grievance office for filing. 829 F.3d at 120-22, 124. To compare, as discussed herein, plaintiff in this case never submitted a grievance to the corrections officers in the SHU to file on her behalf.

because she did not have the necessary writing supplies. (Def. Ex. 6). After plaintiff commenced this action, she changed her story again by claiming in her amended complaint (Dkt. No. 47 at 4-5) and at the evidentiary hearing that she did in fact prepare grievances during her time in the Five Points SHU only to have the corrections staff neglect to forward those grievances to the IGRC for filing. Due to plaintiff's conflicting accounts of her purported efforts to file a grievance from the SHU, the Court declines to credit her contention that she handed grievances to corrections officers who then placed them on the side of the lockbox without ever forwarding them to the IGRC for filing.[7] The Court instead finds that plaintiff never attempted to file a grievance from the Five Points SHU. Thus, plaintiff has not met her burden of demonstrating that the second *Ross* circumstance applies to her case.

Plaintiff also argues in her post-hearing brief that the third *Ross* circumstance applies here because the Five Points corrections staff purportedly intimidated and threatened her not to file any grievances about the May 17, 2011 excessive force incident. The Court declines to credit this argument because it is at odds with plaintiff's contention that she attempted to file grievances during her time in the Five Points SHU only to have the corrections staff interfere with those efforts. If plaintiff truly felt threatened by the corrections staff, then she would not have attempted to file any grievances in the first place.

---

[7] Even if plaintiff had maintained from the outset that the corrections staff placed her grievances on the side of the lockbox instead of inside the box, the Court would have difficulty crediting this version of events because the SHU corridor is continuously monitored by video surveillance that captures the collection of inmate mail. (Tr. 14-15, 48-49). It is difficult to believe that the corrections staff would tamper with plaintiff's grievances in plain view of this surveillance system.

In sum, plaintiff has not met her burden of demonstrating that Directive 4040 was unavailable to her within the meaning of *Ross*. Plaintiff's excessive force claim should therefore be dismissed for failure to exhaust administrative remedies under the PLRA.

## **CONCLUSION**

For the foregoing reasons, it is recommended that plaintiff's excessive force claim against defendants C.O. Mosko, Sgt. Calleri, Sgt. Jones, and C.O. D. Williams be dismissed due to plaintiff's failure to exhaust administrative remedies under the PLRA. If Judge Vilardo adopts this recommendation, the only claim remaining in this action will be plaintiff's retaliation claim against defendant C.O. M. McGrain concerning McGrain filing a false, retaliatory misbehavior report against plaintiff.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** See *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the

- 12 -

Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**

Dated: April 9, 2019
Buffalo, New York

*/s/ Michael J. Roemer*
MICHAEL J. ROEMER
United States Magistrate Judge